**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Justin T. Quinn |
| | : | |
| v. | : | |
| | : | |
| KENNY SCALEY-SANDOVAL; | : | Mag. No. 26-6034 (JTQ) |
| KELVIN TAVAREZ; | : | |
| ENOC PIMENTEL; and | : | |
| TIMOTHY RIOS | : | |
| | : | **CRIMINAL COMPLAINT** |

I, Adam J. Rodriguez, being duly sworn, state that the following is true and correct to the best of my knowledge and belief:

**SEE ATTACHMENT A**

I further state that I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations, and that this complaint is based on the following facts:

**SEE ATTACHMENT B**

continued on the attached pages and made a part hereof.

/s/ Adam J. Rodriguez
Adam J. Rodriguez, Special Agent
Homeland Security Investigations
Department of Homeland Security

Attested to by telephone pursuant to
Fed. R. Crim. P. 4.1 on
June 9, 2026,
in the District of New Jersey

Hon. Justin T. Quinn
United States Magistrate Judge

1

## ATTACHMENT A

## COUNT ONE
(Conspiracy to Distribute Controlled Substances)

From at least on or about August 1, 2025  through on or about June 9, 2026, in the District of New Jersey, and elsewhere, the defendants,

**KENNY SCALEY-SANDOVAL,**
**KELVIN TAVAREZ,** and
**ENOC PIMENTEL,**

did knowingly and intentionally conspire with each other and others to distribute and possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, contrary to Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B).

In violation of Title 21, United States Code, Section 846.

## COUNT TWO
(Conspiracy to Traffic in Firearms)

From at least on or about August 1, 2025 through on or about June 9, 2026, in Mercer County, in the District of New Jersey, and elsewhere, the defendants,

**KENNY SCALEY-SANDOVAL** and
**TIMOTHY RIOS**,

did knowingly conspire and agree with each other and others to ship, transport, transfer, cause to be transported, or otherwise dispose of firearms to another person in and otherwise affecting interstate and foreign commerce, knowing and having reasonable cause to believe that the use, carrying, and possession of the firearm by the recipient would constitute any offense under Federal or State law punishable by imprisonment for a term exceeding one year, contrary to Title 18, United States Code, Section 933(a)(1).

In violation of Title 18, United States Code, Section 933(a)(3).

## ATTACHMENT B

I, Adam J. Rodriguez, am a Special Agent with the Department of Homeland Security, Homeland Security Investigations. I am fully familiar with the facts set forth herein based on my own investigation, my conversations with other law enforcement officers, and my review of reports, documents, and items of evidence. Because this Affidavit is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation. Where the contents of documents and the actions and statements of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

### A.        Background

1.        Since at least in or around August 1, 2025, law enforcement has been investigating cocaine trafficking activities by Kenny Scaley-Sandoval ("SCALEY-SANDOVAL"), Kelvin Tavarez ("TAVAREZ"), and Enoc Pimentel ("PIMENTEL") in or around Trenton, New Jersey. The investigation to date has revealed that SCALEY-SANDOVAL, TAVAREZ, and PIMENTEL are members of a conspiracy to distribute narcotics in New Jersey.

2.        Further, since at least in or around August 1, 2025, law enforcement has been investigating firearm trafficking activities by SCALEY-SANDOVAL and Timothy Rios ("RIOS") in or around Trenton, New Jersey. The investigation to date has revealed that SCALEY-SANDOVAL and RIOS conspired to traffic firearms from Ohio and elsewhere into New Jersey.

3.        At all times relevant to this complaint, neither SCALEY-SANDOVAL nor RIOS were federally licensed dealers, importers, or manufacturers of firearms.

4.        The investigation also revealed that SCALEY-SANDOVAL, TAVAREZ, PIMENTEL, and RIOS frequently communicated using traditional cellphone messaging and messaging through a web-based messaging application.

5.        The conclusions regarding the narcotics and firearm trafficking are based on information from confidential sources ("CS-1" and "CS-2," respectively), working at the direction and supervision of law enforcement officers and whose identifies are known to law enforcement.

6.        Thus far, law enforcement has conducted numerous controlled purchases of cocaine and firearms as summarized in the charts and discussed in greater detail below.

| Drug Purchases Associated with SCALEY-SANDOVAL, TAVAREZ, PIMENTEL | | | |
|---|---|---|---|
| **Transaction Date** | **Drug Type** | **Approximate Quantity** | **Cost** |
| 09/03/2025 | Cocaine | 100 grams (gross weight) | $2,900 |
| 09/22/2025 | Cocaine | 700 grams (net weight) | $12,250 |
| 11/19/2025 | Cocaine | 1,020 grams (gross weight) | $17,000 |
| 02/06/2026 | Cocaine | 1,010 grams (gross weight) | $17,000 |
| 03/19/2026 | Cocaine | 1,023 Grams (gross weight) | $17,000 |
| **Total** | | **3,853 grams** | **$66,150** |

| Firearm Purchases Associated with SCALEY-SANDOVAL and RIOS | | | |
|---|---|---|---|
| **Transaction Date** | **Serial Number(s)** | **Quantity and Type** | **Cost** |
| 09/03/2025 | CP091074 | 1 – <br> • Silver Cobra model CA-380 | $700 |
| 09/11/2025 | LFS959 <br><br> SGU53304 | 2 – <br> • Black Glock 36 .45 caliber handgun <br><br> • Chrome/Black Taurus PT740 Slim .40 caliber handgun | $1,800 |
| 10/28/2025 | 260714 | 1 – <br> • Jimenez Arms 9mm handgun Model J.A. Nine | $700 |
| 11/07/20254 | 20-065056 <br><br> FGAE73 | 2 – <br> • Black Radical Firearms LLC RF-15 rifle <br><br> • KelTec SUB-2000 9MM pistol-carbine | $3,000 |
| 12/12/2025 | FHT331 <br><br> ADE390096 <br><br> GM143373 | 3 – <br> • Glock 36 .45 caliber Handgun <br><br> • Taurus G2C 9mm handgun <br><br> • Springfield Armory XD .40 caliber handgun | $3,000 |

| 01/13/2026 | 384-94713<br><br>TG019-22C07726<br><br>4621593 | 3 –<br>• Black Ruger Security-9 9mm handgun<br><br>• Black BRG9 Elite handgun<br><br>• Black and silver Phoenix Arms Model HP221 .22LR Cal Auto handgun | $2,500 |
|---|---|---|---|
| 02/06/2026 | AGFK520 | 1 –<br>• Glock 42 .380 caliber handgun | $1,000 |
| 05/02/2026 | XYL183<br><br>YN1153<br><br>T0620-26DS01816 | 3 –<br>• Glock .40 caliber Model 27 handgun<br><br>• Diamondback 9mm Model B9 handgun<br><br>• Tisas .45 caliber Model 1911 AL Govt. handgun | $3,000 |
| **Total** | | **16** | **$15,700** |

**B.    Law Enforcement Learn of Scaley-Sandoval's Firearm Trafficking**

7.    In August 2025, CS-1, working at the direction and supervision of law enforcement, provided information to law enforcement that SCALEY-SANDOVAL would be receiving a delivery of firearms from an individual or individuals from Ohio.

8.    In response, during the week of August 29, 2025, law enforcement established surveillance in or around Scaley-Sandoval's residence in Trenton (the "Scaley-Sandoval Premises").

9.    At approximately 10:30 p.m., law enforcement observed a black Kia Forte (the "Kia"), with an Ohio license plate, arrive in Trenton and park across the street from Scaley-Sandoval Premises. Minutes later, a black BMW bearing a Maryland license plate (the "BMW"), a vehicle known by law enforcement to be operated by SCALEY-SANDOVAL, stopped next to the Kia. The driver of the Kia, later identified as RIOS, exited the Kia and spoke with the driver of the BMW through the BMW's passenger-side window. RIOS reentered the Kia and followed the BMW as they departed the area.

10.    Law enforcement obtained subscriber and dialing information for SCALEY-SANDOVAL's cellphone (the "Scaley-Sandoval Cellphone"). The Scaley-

Sandoval Cellphone received calls from two Ohio-based phone numbers ("Ohio Number-1" and "Ohio Number-2," respectively) on August 29, 2025, including near the time that the Kia arrived near the Scaley-Sandoval Premises.

11.     Law enforcement obtained subscriber information for Ohio Number-1, which revealed that RIOS was the subscriber (the "Rios Cellphone"), with an address in Lorain, Ohio.

12.     Law enforcement obtained subscriber information for Ohio Number-2, which revealed subscriber information for an individual ("Individual-1"), with an address in Lorain, Ohio.

13.     On or about August 29, 2025, a license plate reader ("LPR") camera[1] captured the Kia in Elyria, Ohio at around 2:25 p.m. Hours later, an LPR camera captured the Kia in or around Trenton, New Jersey at around 10:27 p.m. The travel time between the locations in Ohio and New Jersey is consistent with the Kia traveling from Ohio to New Jersey.

### C.        The September 3, 2025 Cocaine and Firearm Purchases

14.     During the week of September 3, 2025, CS-2, working at the direction and supervision of law enforcement, contacted SCALEY-SANDOVAL on the Scaley-Sandoval Cellphone to discuss the purchase of cocaine. SCALEY-SANDOVAL agreed to sell CS-2 100 grams of cocaine for $2,900 and directed CS-2 to meet him near the Scaley-Sandoval Premises to complete the transaction.

15.     Law enforcement observed SCALEY-SANDOVAL exit the front door of the Scaley-Sandoval Premises and enter the BMW, which was parked on the street.

16.     When CS-2 arrived, he/she entered the BMW. Inside the BMW, SCALEY-SANDOVAL provided CS-2 with the previously agreed-upon 100 grams of cocaine, and CS-2 provided SCALEY-SANDOVAL with $2,900 in cash to complete the transaction.

17.     While inside the BMW, SCALEY-SANDOVAL informed CS-2 that he has access to additional quantities of cocaine, and can provide one, two, or three kilograms at a time. CS-2's recording device, which was provided to CS-2 by law enforcement prior to the transaction, recorded the transaction and conversation.

---

[1] An LPR captures images of license plates and allows law enforcement agencies to identify and compare those images of plates against those of cars driven by individuals suspected of being involved in illegal activities.

18.     After the drug transaction, law enforcement observed SCALEY-SANDOVAL exit the BMW and approach the front door of the Scaley-Sandoval Premises. At the door, SCALEY-SANDOVAL handed an individual ("Individual-2"), who was standing inside the doorway, an item. SCALEY-SANDOVAL reentered the BMW and traveled to an address associated with TAVAREZ (the "Tavarez Premises") in Trenton.

19.     SCALEY-SANDOVAL parked the BMW in front of the Tavarez Premises. An individual ("Individual-3"), who matched the description of TAVAREZ, exited the front door of the Tavarez Premises, approached the BMW, and opened the passenger door. SCALEY-SANDOVAL and Individual-3 engaged in a hand-to-hand transaction. Individual-3 then reentered the Tavarez Premises. SCALEY-SANDOVAL departed in the BMW and returned to and entered the Scaley-Sandoval Premises.

20.     The cocaine purchased from SCALEY-SANDOVAL was subsequently submitted to a law enforcement laboratory for chemical analysis, where it tested positive for cocaine with a gross weight of approximately 100 grams.

21.     Later that day, SCALEY-SANDOVAL, using the Scaley-Sandoval Cellphone, sent a message to CS-2 stating that he had a "new 380" to sell CS-2, which CS-2 and law enforcement interpreted to mean SCALEY-SANDOVAL was offering to sell CS-2 a new model .380 caliber handgun (the ".380 Handgun").

22.     At law enforcement's direction, CS-2 contacted SCALEY-SANDOVAL on the Scaley-Sandoval Cellphone and negotiated the price of the firearm purchase with SCALEY-SANDOVAL, who agreed on $700 for the .380 Handgun. SCALEY-SANDOVAL instructed CS-2 to meet him at the Scaley-Sandoval Premises to complete the transaction.

23.     Thereafter, law enforcement observed SCALEY-SANDOVAL exit the Scaley-Sandoval Premises and enter the BMW, which was parked near his residence. Upon CS-2's arrival, CS-2 entered the passenger seat of the BMW. Inside the BMW, CS-2 provided SCALEY-SANDOVAL with $700, and SCALEY-SANDOVAL provided CS-2 with the .380 Handgun and 19 rounds of ammunition. The .380 Handgun was later determined to be a silver Cobra model CA-380, bearing serial number CP091074. SCALEY-SANDOVAL informed CS-2 that he has access to firearms, bulletproof shirts, bulletproof vests, and grenades, and that he can obtain these items from his "friends from Ohio." CS-2's recording device, which was provided to CS-2 by law enforcement prior to the transaction, recorded the transaction and conversation.

**D.        The September 7, 2025 Firearms Delivery**

24.        On or about September 6, 2025, CS-1 informed law enforcement officers that SCALEY-SANDOVAL would be receiving a delivery of firearms on September 7, 2025.

25.        Around 2:00 a.m. on September 7, 2025, an LPR camera captured the Kia entering Trenton, New Jesey. Around this time, law enforcement officers observed multiple incoming phone calls to the Scaley-Sandoval Cellphone from Ohio Number-2.

26.        At around 2:14 a.m., law enforcement officers observed the Kia enter an alleyway ("Alleyway-1") behind the Scaley-Sandoval Premises.

27.        At around 2:16 a.m., law enforcement officers observed a black Mercedes Benz registered to and operated by SCALEY-SANDOVAL (the "Mercedes") enter Alleyway-1 where the Kia was located. After a brief period, the Kia and the Mercedes exited Alleyway-1 together.

28.        At around 3:41 a.m., SCALEY-SANDOVAL, using the Scaley-Sandoval Cellphone, sent a text message to CS-2 stating, "have that one, let me know."  The following morning, at approximately 10:48 a.m., SCALEY-SANDOVAL sent CS-2 an image of three handguns and offered CS-2 two firearms for $1,400.

**E.        The September 11, 2025 Firearms Purchase**

29.        On or about September 9, 2025, SCALEY-SANDOVAL called CS-2 and informed him/her that SCALEY-SANDOVAL may have another buyer for the firearms but that he has other options for purchase. CS-2 responded in a message to SCALEY-SANDOVAL that he/she wanted to purchase the two firearms: a Glock (the "Glock") and a .40 caliber handgun (the ".40 Handgun"), from SCALEY-SANDOVAL for $1,800.

30.        During the week of September 11, 2025, SCALEY-SANDOVAL instructed CS-2 to meet him near the Scaley-Sandoval Premises to complete the firearms transaction. When CS-2 arrived, SCALEY-SANDOVAL got into CS-2's vehicle and provided CS-2 with the Glock, which was concealed within a white box.

31.        SCALEY-SANDOVAL and CS-2 then exited CS-2's vehicle and entered the Mercedes, which was parked nearby. With CS-2 inside the Mercedes, SCALEY-SANDOVAL drove to an intersection in Trenton. SCALEY-SANDOVAL, using the Scaley-Sandoval Cellphone, called an Individual ("Individual-4") to inform Individual-4 that SCALEY-SANDOVAL had arrived.

32.    A short time later, SCALEY-SANDOVAL, driving the Mercedes, followed a black pickup truck (the "pickup truck") into an alleyway ("Alleyway-2"). Using the Scaley-Sandoval Cellphone, SCALEY-SANDOVAL contacted two phone numbers, one associated with TAVAREZ, (the "Tavarez Cellphone"), and another individual ("Individual-5"). In a review of SCALEY-SANDOVAL's communication history, SCALEY-SANDOVAL and the Tavarez Cellphone communicated approximately 51 times on September 11, 2025.

33.    SCALEY-SANDOVAL approached the pickup truck and obtained a firearm from therein. SCALEY-SANDOVAL reentered the Mercedes and presented the .40 Handgun to CS-2 to complete and CS-2 provided SCALEY-SANDOVAL with the $1,800 for both firearms. The Glock was later revealed to be a black Glock 36 .45 caliber handgun, bearing serial number LFS959, and the .40 Handgun to be a chrome/black Taurus PT740 Slim .40 caliber handgun, bearing serial number SGU53304.

34.    While inside the Mercedes, SCALEY-SANDOVAL informed CS-2 that "my boy" was coming to Trenton sometime between September 18, 2025 and September 28, 2025, and that SCALEY-SANDOVAL could provide CS-2 with firearms, including long-guns and other rifles, bulletproof shirts, and grenades. In particular, SCALEY-SANDOVAL informed CS-2 that he could sell CS-2 an AR-15 style rifle for $1,000 and discussed the price he could provide for a "brick" of cocaine. CS-2's recording device, which was provided to CS-2 by law enforcement prior to the transaction, recorded the transaction and conversation.

### F.    The September 22, 2025 Cocaine Delivery

35.    During the week of September 22, 2025, at approximately 12:02 p.m., SCALEY-SANDOVAL discussed a proposed sale of one kilogram of cocaine with CS-2. SCALEY-SANDOVAL informed CS-2 that he would have the cocaine for CS-2 to complete the transaction later that same day.

36.    Shortly after SCALEY-SANDOVAL spoke with CS-2 about the cocaine sale, the Scaley-Sandoval Cellphone contacted the Tavarez Cellphone. There were approximately 70 communications between the Scaley-Sandoval Cellphone and Tavarez Cellphone on that date.

37.    Around 2:46 p.m., SCALEY-SANDOVAL sent a text message using the Scaley-Sandoval Cellphone to CS-2 and offered to sell CS-2 700 grams of cocaine for $12,250. SCALEY-SANDOVAL and CS-2 then confirmed their deal through a telephone call and agreed to meet near the Scaley-Sandoval Premises. During this time, SCALEY-SANDOVAL communicated with TAVAREZ.

38.     CS-2 arrived near the Scaley-Sandoval Premises and parked behind the Mercedes. SCALEY-SANDOVAL exited the front door of the Scaley-Sandoval Premises and entered the Mercedes. SCALEY-SANDOVAL then exited the Mercedes and entered the passenger side of CS-2's vehicle. While inside, SCALEY-SANDOVAL told CS-2 that he had to go to another house to pick up the cocaine for their transaction. SCALEY-SANDOVAL then reentered the Mercedes and drove away from Scaley-Sandoval Premises.

39.     At around 5:00 p.m., law enforcement observed SCALEY-SANDOVAL park the Mercedes near the Tavarez Premises.

40.     At approximately 5:10 p.m., CS-2 contacted SCALEY-SANDOVAL to discuss the pending cocaine transaction. Their conversation included a discussion about cocaine quantities available for purchase that day.

41.     Between 5:16 and 5:41 p.m., TAVAREZ, using the Tavarez Cellphone, communicated with SCALEY-SANDOVAL on the Scaley-Sandoval Cellphone approximately 16 times.

42.     At around 5:42 p.m., law enforcement observed SCALEY-SANDOVAL drive the Mercedes into the alleyway behind the Tavarez Premises. TAVAREZ walked through the backyard of the Tavarez Premises with a cellphone in one hand and an object in the other. TAVAREZ passed the object into the passenger-side window of the Mercedes. SCALEY-SANDOVAL spoke with TAVAREZ and then departed the area in the Mercedes. TAVAREZ returned to the Tavarez Premises.

43.     SCALEY-SANDOVAL returned to the Scaley-Sandoval Premises and parked near CS-2's vehicle. CS-2 entered the Mercedes. Inside the Mercedes, SCALEY-SANDOVAL and CS-2 completed the previously agreed-upon cocaine transaction: SCALEY-SANDOVAL gave CS-2 approximately 700 grams of cocaine and CS-2 gave SCALEY-SANDOVAL $12,250 in cash. SCALEY-SANDOVAL also discussed with CS-2 that he could get grenades and an AK-type firearm to sell. CS-2's recording device, which was provided to CS-2 by law enforcement prior to the transaction, recorded the transaction and conversation.

44.     The cocaine purchased from SCALEY-SANDOVAL was subsequently submitted to a law enforcement laboratory for chemical analysis, where it tested positive for cocaine with a net weight of 699.76 grams.

45.     After the drug sale, law enforcement observed SCALEY-SANDOVAL, still in the Mercedes, counting cash. SCALEY-SANDOVAL then departed the area. At approximately 6:06 p.m., SCALEY-SANDOVAL exited the Mercedes and walked to the front door of the Tavarez Premises with a hand under his shirt. SCALEY-SANDOVAL knocked on the door and reached into the threshold of the doorway, but

did not enter the house. SCALEY-SANDOVAL walked back to the Merecedes and drove away from the area.

46.    Between 6:03 p.m. and 6:18 p.m., the Tavarez Cellphone communicated with the Scaley-Sandoval Cellphone approximately 10 times.

**G.    The October 28, 2025 Firearm Purchase and Proposed Cocaine Purchase**

47.    On or about October 2, 2025, SCALEY-SANDOVAL sent CS-2 an image of a firearm and the next day SCALEY-SANDOVAL offered to sell the firearm in the picture to CS-2 for $1,600. On or about October 3, 2026, SCALEY-SANDOVAL and CS-2 continued their discussion from October 2 regarding firearms sales. CS-2 informed SCALEY-SANDOVAL that he sends his firearms to individuals in Mexico.

48.    On or about October 16, 2025, SCALEY-SANDOVAL contacted CS-2 to inquire about the firearm discussed on October 2 and October 3 because his "person" from "Ohio" was coming to New Jersey and needed to know about the proposed transaction.

49.    On or about October 19, 2025, SCALEY-SANDOVAL sent CS-2 photos of multiple firearms, including a Jimenez Arms 9mm handgun (the "Jimenez 9mm").



50.    Approximately four minutes before SCALEY-SANDOVAL sent CS-2 the photographs of the firearms described above, the Rios Cellphone sent numerous images to the Scaley-Sandoval Cellphone.

51.    On or about October 20, 2025, SCALEY-SANDOVAL and CS-2 negotiated prices for a proposed firearm purchase. Later that day, SCALEY-SANDOVAL sent CS-2 a video of a long gun and offered to sell it for $1,500.

52.    From approximately 8:20 a.m. to approximately 4:10 p.m. on October 20, 2025, the Rios Cellphone had 19 contacts with the Scaley-Sandoval Cellphone.

53.    On or about October 21, 2025, CS-2 attempted to negotiate with SCALEY-SANDOVAL on pricing for the long gun firearm that SCALEY-SANDOVAL offered to sell by offering SCALEY-SANDOVAL $1,000. SCALEY-SANDOVAL stated that he would be willing to lower the price, but he could not because it was "up to the guy in Ohio" who was "taking a lot of risk."  Later that day, SCALEY-SANDOVAL sent CS-2 two photos of a .45 caliber handgun (the "October .45 Handgun") and offered to sell it for $800. CS-2 agreed to purchase the October .45 Handgun for $800. SCALEY-SANDOVAL agreed to "hold" the October .45 Handgun for CS-2.

54.    On or about October 24, 2025, SCALEY-SANDOVAL contacted CS-2 and asked CS-2 to confirm whether he/she will purchase the October .45 Handgun because "they"[2] are asking him. CS-2 confirmed that he/she will purchase the October .45 Handgun on October 28, 2025.

55.    On or about October 26, 2025, at approximately 12:47 a.m., law enforcement observed the Kia enter Trenton, New Jersey. The Rios Cellphone communicated with the Scaley-Sandoval Cellphone at approximately 12:53 a.m.

56.    At approximately 12:58 a.m., the Mercedes, with SCALEY-SANDOVAL inside, entered Alleyway-1. At approximately 1:21 a.m., the Kia entered Alleyway-1. At approximately 1:28 a.m., the Kia exited Alleyway-1 and departed Trenton.

57.    Between approximately 12:57 a.m. and 1:21 a.m. on October 26, 2025, the Rios Cellphone had 15 contacts with the Scaley-Sandoval Cellphone.

58.    On or about October 27, 2025, SCALEY-SANDOVAL agreed to meet CS-2 the next day at the Scaley-Sandoval Premises to sell CS-2 the October .45 Handgun.

59.    During the week of October 28, 2025, SCALEY-SANDOVAL informed CS-2 that he no longer had the October .45 Handgun available for sale. SCALEY-SANDOVAL did not want CS-2 to leave "empty handed," and offered other firearms that he could sell CS-2, including .40 caliber, 9mm, and 25mm firearms. SCALEY-SANDOVAL sent two photographs of two different firearms, one of which was the Jimenez 9mm. SCALEY-SANDOVAL agreed to sell CS-2 the Jimenez 9mm for $700.

60.    At approximately 11:27 a.m., law enforcement observed CS-2 arrive at the Scaley-Sandoval Premises. At approximately 11:35 a.m., law enforcement

---

[2] Based on this investigation, the context of this communication and others, and my training and experience, I understand that "they" refers to RIOS.

observed SCALEY-SANDOVAL exit the front door of the Scaley-Sandoval Premises and enter CS-2's vehicle. Once inside, SCALEY-SANDOVAL gave CS-2 the Jimenez 9mm, two handgun magazines, and 18 rounds of ammunition and CS-2 gave SCALEY-SANDOVAL $700 to complete the transaction. The Jimenez 9mm was later determined to be a Jimenez Arms 9mm handgun Model J.A. Nine bearing serial number 260714. SCALEY-SANDOVAL also discussed a future narcotics transaction with CS-2 and stated that he could obtain a "block"[3] for CS-2. The transaction and conversation were recorded on CS-2's recording device.

61.     At approximately 11:51 a.m., the Scaley-Sandoval Cellphone sent the Rios Cellphone three messages and two images. The Rios Cellphone sent the Scaley-Sandoval Cellphone a message at approximately 4:37 p.m.

### H.      The November 7, 2025 Firearms Purchase

62.     On or about November 2, 2025, SCALEY-SANDOVAL sent CS-2 a photo of a KelTec firearm and offered to sell it to CS-2 for $1,600.

63.     During the week of November 5, 2025, SCALEY-SANDOVAL, communicated with CS-2 and offered to sell CS-2 the previously offered KelTec firearm and a rifle for a total price of $3,000. SCALEY-SANDOVAL also told CS-2 that "he"[4] had two "long ones," referring to rifles.

64.     On November 7, 2025, at approximately 4:05 p.m., the Scaley-Sandoval Cellphone placed an outgoing voice call to the Rios Cellphone. Approximately 30 minutes later, the Rios Cellphone placed a voice call to the Scaley-Sandoval Cellphone. Law enforcement officers then observed a 2011 silver Acura sedan bearing an Ohio temporary registration registered to RIOS (the "Acura") enter Alleyway-1.

65.     At approximately 4:35 p.m., law enforcement officers observed SCALEY-SANDOVAL exit the backdoor of the Scaley-Sandoval Premises. SCALEY-SANDOVAL then entered the Acura through the rear passenger-side door.

66.     At approximately 4:40 p.m., law enforcement officers observed SCALEY-SANDOVAL exit the Acura and enter CS-2's vehicle. RIOS then exited the Acura and opened the hood of the Acura. RIOS retrieved an item, later identified as a Radical RF-15 Rifle (the "November Rifle") from under the hood and within the engine block area of the Acura. RIOS put the November Rifle into CS-2's vehicle through the rear

---

[3] Based on my training and experience, I understand the reference to a "block" to mean a kilogram of cocaine.

[4] Based on this investigation, the context of this communication and others, and my training and experience, I understood that "he" referred to RIOS.

passenger-side door. RIOS returned to the Acura multiple times to obtain items from the Acura before giving the items to CS-2, who remained in his/her vehicle. The additional items included a KelTec 9mm firearm the ("KelTec") and various ammunition for the November Rifle and KelTec. The KelTec matched the image of the KelTec firearm that SCALEY-SANDOVAL had sent CS-2 on or about November 2, 2025. The November Rifle was later determined to be a black Radical Firearms LLC RF-15 rifle, bearing serial number 20-065056, and the KelTec a KelTec SUB-2000 9mm pistol-carbine, bearing serial number FGAE73.



### I.       The November 19, 2025 Cocaine Purchase

67.     On or about November 18, 2025, at law enforcement's direction, CS-2 contacted SCALEY-SANDOVAL to discuss the purchase of one to two kilograms of cocaine.

68.     SCALEY-SANDOVAL informed CS-2 that he would call CS-2 back. Shortly after ending the conversation with CS-2, the Scaley-Sandoval Cellphone contacted the Tavarez Cellphone. SCALEY-SANDOVAL then contacted CS-2 and informed CS-2 that he would sell CS-2 a kilogram of cocaine for $17,000. SCALEY-SANDOVAL informed CS-2 that if CS-2 wanted to buy an additional kilogram of cocaine, SCALEY-SANDOVAL could arrange that. Later that day, CS-2 contacted SCALEY-SANDOVAL and confirmed that CS-2 would purchase one kilogram of cocaine from SCALEY-SANDOVAL.

69.     During that discussion, CS-2 asked SCALEY-SANDOVAL if he had any firearms for sale. SCALEY-SANDOVAL stated that he did not have any available at the moment but would check. Shortly after ending the conversation with CS-2, the

Scaley-Sandoval Cellphone contacted the Rios Cellphone. SCALEY-SANDOVAL then messaged CS-2 that he would not have any firearms available tomorrow.

70.    During the week of November 19, 2025, at approximately 12:48 p.m., SCALEY-SANDOVAL spoke with CS-2 about the previously arranged cocaine purchase. They agreed to meet at the Scaley-Sandoval Premises later that day.

71.    After SCALEY-SANDOVAL spoke with CS-2 and leading up to the scheduled cocaine transaction, the Scaley-Sandoval Cellphone, the Tavarez Cellphone, and a cellphone subscribed to PIMENTEL (the "Pimentel Cellphone") were in frequent communication with each other.

72.    At approximately 4:40 p.m., CS-2 parked his/her vehicle near the Scaley-Sandoval Premises.

73.    After CS-2 arrived near the Scaley-Sandoval Premises, the Scaley-Sandoval Cellphone, the Tavarez Cellphone and the Pimental Cellphone continued their communications.

74.    At approximately 5:09 p.m., SCALEY-SANDOVAL entered CS-2's vehicle and informed CS-2 that he was waiting for the cocaine to be delivered. While waiting for the cocaine to be delivered, SCALEY-SANDOVAL had frequent contact with the Tavarez Cellphone and the Pimental Cellphone.

75.    At approximately 7:05 p.m., law enforcement observed an individual walk through the backyard of the Tavarez Premises and enter the front passenger door of a 2013 black Honda Crosstour bearing a New Jersey registration number (the "Crosstour"). Based on my training and experience and my participation in this investigation, I believe that the individual who entered the Crosstour was TAVAREZ.

76.    At approximately 7:08 p.m., SCALEY-SANDOVAL exited CS-2's vehicle and entered the rear-passenger side door of the Crosstour. The Crosstour drove and parked across the street from CS-2's vehicle.

77.    A short time later, SCALEY-SANDOVAL exited the Crosstour and reentered CS-2's vehicle. While inside CS-2's vehicle, SCALEY-SANDOVAL completed the previously agreed upon cocaine transaction: he gave CS-2 the kilogram of cocaine and CS-2 gave SCALEY-SANDOVAL $17,000 in cash.

78.    The cocaine purchased from SCALEY-SANDOVAL was subsequently submitted to a law enforcement laboratory for chemical analysis, where it tested positive for cocaine with a gross weight of 1,020.40 grams.

79.    An analysis of communications between the Scaley-Sandoval Cellphone and the Tavarez Cellphone between November 18 and November 19 showed approximately 138 communications.

**J.        The December 12, 2025 Firearms Purchase**

80.    On or about December 5, 2025, SCALEY-SANDOVAL informed CS-2 that he would be traveling to Ohio to obtain firearms from his Ohio associates.

81.    On or about December 6, 2025, SCALEY-SANDOVAL texted photographs of four handguns to CS-2. The Scaley-Sandoval Cellphone and Rios Cellphone were in contact shortly before SCALEY-SANDOVAL sent the photographs to CS-2.

82.    CS-2, communicating with SCALEY-SANDOVAL, agreed to purchase three of the handguns for a total of $3,000. SCALEY-SANDOVAL and CS-2 agreed to complete the transaction on or about December 12, 2025 at the Scaley-Sandoval Premises.

83.    Law enforcement officers were also monitoring the location of the Scaley-Sandoval Cellphone and observed it traveling from in or around Trenton, New Jersey to in or around Lorain, Ohio. In addition, LPR data showed the Mercedes in Lorain, Ohio in or around the same time. An analysis of communications between Scaley-Sandoval Cellphone and Rios Cellphone revealed over 50 contacts between the two on December 6, 2025.

84.    Law enforcement officers observed the Scaley-Sandoval Cellphone traveling from in or around Lorain, Ohio to in or around Trenton, New Jersey from the evening of December 6, 2025 to the morning of December 7, 2025.

85.    On or about December 7, 2025, at around 5:35 a.m., law enforcement observed the Mercedes entering Alleyway-1. SCALEY-SANDOVAL exited the driver-side door of the Mercedes and opened the hood and trunk. He then retrieved an object from under the hood and walked to the trunk. SCALEY-SANDOVAL reentered the Mercedes and drove to Second Street and parked in front of the Scaley-Sandoval Premises. SCALEY-SANDOVAL exited the Mercedes, opened the trunk, and retrieved an object from it. He then brought the object into the Scaley-Sandoval Premises.

86.    Following CS-2's discussion with SCALEY-SANDOVAL regarding the December 12, 2025 firearm purchase, CS-2 arrived at the Scaley-Sandoval Premises in his/her vehicle and parked nearby. At approximately 1:32 p.m., law enforcement observed SCALEY-SANDOVAL exit the Scaley-Sandoval Premises and enter CS-2's vehicle.

87.    Once inside CS-2's vehicle, SCALEY-SANDOVAL completed the previously agreed-upon transaction: he provided CS-2 with three handguns and associated magazines and CS-2 provided SCALEY-SANDOVAL with $3,000 in cash.

88.    While in CS-2's vehicle, SCALEY-SANDOVAL showed CS-2 photographs of additional firearms, including some with high-capacity magazines. He also discussed selling CS-2 "switches" that would allow semiautomatic firearms to function as automatic firearms. SCALEY-SANDOVAL also discussed the importation of cocaine to the United States. SCALEY-SANDOVAL stated that this would be "his" thing and that he has a direct line to the suppliers.

89.    SCALEY-SANDOVAL exited CS-2's vehicle and entered the Scaley-Sandoval Premises. CS-2 departed the area. The transaction and their communications were recorded on CS-2's recording device.

90.    The firearms were later identified as: (1) one Glock .45 caliber handgun, bearing serial number FHT331, (2) one Taurus G2C 9mm handgun, bearing serial number ADE390096, and (3) one Springfield Armory XD .40 caliber handgun, bearing serial number GM143373.



**K.      The January 13, 2026 Firearms Purchase**

91.      In early January 2026, SCALEY-SANDOVAL provided another phone number to CS-2, the (the "Second Scaley-Sandoval Cellphone") as his new contact number. The Scaley-Sandoval Cellphone continued to be active, however, including on SCALEY-SANDOVAL's communications.

92.      On or about January 6, 2026, SCALEY-SANDOVAL, using the Second Scaley-Sandoval Cellphone, sent a video and photographs of numerous handguns to CS-2. SCALEY-SANDOVAL offered to sell CS-2 three firearms for $2,500.

93.      At approximately 6:25 p.m., a gray Acura MDX (the "Acura MDX") bearing an Ohio temporary registration number registered to RIOS, arrived in Alleyway-1. An analysis of communication between the Scaley-Sandoval Cellphone and the Rios Cellphone revealed contacts between the two during this time.

94.      On or about January 7, 2026, SCALEY-SANDOVAL, using the Second Scaley-Sandoval Cellphone, called CS-2 and stated that he had possession of the guns. SCALEY-SANDOVAL confirmed that he would sell CS-2 three handguns for $2,500. He also offered to sell CS-2 a rifle for $1,800. SCALEY-SANDOVAL and CS-2 agreed that they would meet the following week to complete the transaction.

95.      During the week of January 12, 2026, SCALEY-SANDOVAL, using the Second Scaley-Sandoval Cellphone, messaged CS-2 to confirm January 13, 2026 as the date to complete the previously agreed upon firearms transaction. Later that day, SCALEY-SANDOVAL, using the Second Scaley-Sandoval Cellphone, sent a photo of a rifle to CS-2.

96.      On or about January 13, 2026, at approximately 2:28 p.m., CS-2 arrived at the Scaley-Sandoval Premises and parked nearby.

97.      At approximately 2:36 p.m., SCALEY-SANDOVAL entered CS-2's vehicle it. Once inside, SCALEY-SANDOVAL and CS-2 completed the previously agreed to firearms transaction: SCALEY-SANDOVAL gave CS-2 three firearms, magazines, and an optic scope and, in exchange, CS-2 gave SCALEY-SANDOVAL $2,500 in cash.

98.      While in CS-2's vehicle, SCALEY-SANDOVAL offered to sell CS-2 a rifle, but CS-2 declined. SCALEY-SANDOVAL also informed CS-2 that he wants to get rid of the "material" that he has now before obtaining "material" from "down

there."[5] SCALEY-SANDOVAL informed CS-2 that he sold his cars to raise money to accomplish this goal. SCALEY-SANDOVAL also stated that he believed one of the firearms that CS-2 purchased could be transformed from semiautomatic to automatic.

99.    The firearms purchased from SCALEY-SANDOVAL were determined to be: (1) one black Ruger Security-9 9mm handgun, bearing serial number 384-94713, (2) one black BRG9 Elite handgun, bearing serial number TG019-22C07726, and (3) one black and silver Phoenix Arms Model HP221 .22LR Cal Auto handgun, bearing serial number 4621593. CS-2 also turned over a black optic scope fitted for a rifle.



### L.    The February 6, 2026 Cocaine and Firearm Purchase

100.    During the week of February 3, 2026, SCALEY-SANDOVAL discussed with CS-2 a potential purchase of one kilogram of cocaine to occur within the next few days. During those discussions, SCALEY-SANDOVAL assured CS-2 that he would contact "his people" to ensure that the cocaine would be ready for purchase at the agreed date and time. In addition to the cocaine, SCALEY-SANDOVAL also agreed to cell CS-2 a handgun for a total price of $18,000. SCALEY-SANDOVAL agreed to meet CS-2 on February 6, 2026 to complete the transaction.

101.    An analysis of SCALEY-SANDOVAL's communications on February 3, 2026 showed contact between the Tavarez Cellphone and the Scaley-Sandoval

---

[5] Based on my training and experience, the reference to "material" above means cocaine, and "down there" means the southern United States border.

Cellphone in close proximity to the communication between SCALEY-SANDOVAL and CS-2 regarding the cocaine purchase. Likewise, an analysis of the Pimentel Cellphone and the Tavarez Cellphone on February 3, 2026 showed contact between the two in close proximity to the communication between SCALEY-SANDOVAL and CS-2 regarding the cocaine purchase.

102.   On or about February 6, 2026, SCALEY-SANDOVAL, using the Second Scaley-Sandoval Cellphone, called CS-2 and advised that he was ready to complete their previously agreed upon transaction.

103.    At approximately 2:29 p.m., CS-2 arrived in the vicinity of the Scaley-Sandoval Premises.

104.   At approximately 2:48 p.m., SCALEY-SANDOVAL entered CS-2's vehicle in the passenger side door. While inside CS-2's vehicle, SCALEY-SANDOVAL provided CS-2 with the previously agreed upon handgun, including a magazine and ammunition. SCALEY-SANDOVAL told CS-2 that he was waiting for the cocaine and joked that the recent snowfall had delayed the delivery.

105.   Between approximately 2:03 p.m. and 3:02 p.m., the Scaley-Sandoval Cellphone had approximately 18 contacts with the Tavarez Cellphone.

106.   Around 3:06 p.m., the Pimentel Cellphone had approximately six contacts with the Tavarez Cellphone.

107.   At approximately 3:16 p.m., TAVAREZ exited the backyard of the Tavarez Premises, entered a white van, and departed the area.

108.   At approximately 3:20 p.m., SCALEY-SANDOVAL exited CS-2's vehicle and entered TAVAREZ's white van.

109.   SCALEY-SANDOVAL exited the white van and reentered CS-2's vehicle. After he entered, SCALEY-SANDOVAL handed CS-2 the previously agreed upon cocaine, which at that point was inside a black plastic bag. To complete the transaction for the handgun and cocaine, CS-2 handed SCALEY-SANDOVAL $18,000 in cash, which at that point was inside a brown paper bag (the "Brown Bag").

110.   SCALEY-SANDOVAL exited CS-2's vehicle with the Brown Bag and handed it to TAVAREZ through the driver's side window of the white van. TAVAREZ drove away. Between approximately 4:04 p.m. and 4:16 p.m., Tavarez's Cellphone had approximately 62 contacts with Pimentel's Cellphone.

111.   The handgun purchased from SCALEY-SANDOVAL was to determined to be a Glock 42 .380 caliber handgun, bearing serial number AGFK520, with a

magazine and six rounds of ammunition. The cocaine purchased from SCALEY-SANDOVAL was subsequently submitted to a law enforcement laboratory for chemical analysis, where it tested positive for cocaine with a gross weight of 1,010.12 grams.



112.    Law enforcement reviewed cellphone location information associated with the Pimentel Cellphone on February 6, 2026. The review revealed that the Pimentel Cellphone traveled south from in or around Cliffton, New Jersey, within range of an address associated with Pimentel in Clifton, New Jersey (the "Pimentel Clifton Premises") to the Scaley-Sandoval Premises and back.

### M.    The March 19, 2026 Cocaine Purchase

113.    During the week of March 19, 2026, CS-2, working at the direction and supervision of law enforcement, spoke with SCALEY-SANDOVAL to discuss a potential purchase of cocaine. SCALEY-SANDOVAL agreed to sell CS-2 two kilograms of cocaine at a price of $17,000 per kilogram. SCALEY-SANDOVAL stated that he could provide the two kilograms of cocaine later that day.

114. Starting at approximately 9:58 a.m., there were numerous communications between the Scaley-Sandoval Cellphone and the Tavarez Cellphone and between the Tavarez Cellphone and Pimentel Cellphone.

115. At approximately 11:50 a.m., SCALEY-SANDOVAL contacted CS-2 and discussed the timing for the cocaine delivery. SCALEY-SANDOVAL suggested around 4:00 p.m. He also confirmed the previously agreed upon price for the cocaine, $17,000 per kilogram.

116. At approximately 4:57 p.m., CS-2 contacted SCALEY-SANDOVAL to discuss the delay in the timing for the cocaine delivery. SCALEY-SANDOVAL blamed the delay on his supplier. Thereafter, there were communications between the Scaley-Sandoval Cellphone and the Tavarez Cellphone and the Tavarez Cellphone and the Pimentel Cellphone.

117. At approximately 5:12 p.m., SCALEY-SANDOVAL contacted CS-2 to discuss the cocaine delivery. SCALEY-SANDOVAL stated that the delivery can happen at 7:00 p.m. but indicated that he would try for 6:00 p.m. instead. Thereafter, there were communications between the Scaley-Sandoval Cellphone and the Tavarez Cellphone and the Tavarez Cellphone and the Pimentel Cellphone.

118. At approximately 5:16 p.m., SCALEY-SANDOVAL contacted CS-2 to inform him/her that the delivery cannot happen at 6:00 p.m. and suggested 7:00 p.m. CS-2 agreed but stated that the delay in the delivery meant that he would be purchasing one, not two kilograms of cocaine. SCALEY-SANDOVAL agreed and stated that he would confirm the time with his supplier.

119. Shortly afterwards, the Tavarez Cellphone exchanged messages with the Scaley-Sandoval Cellphone, and the Tavarez Cellphone exchanged messages with the Pimentel Cellphone.

120. At approximately 5:34 p.m., law enforcement observed TAVAREZ exit the Tavarez Premises and enter a 2018 Dodge Durango bearing a Pennsylvania registration number (the "Dodge Durango"). TAVAREZ drove away from the area.

121. Shortly afterwards, the Tavarez Cellphone exchanged messages with the Scaley-Sandoval cellphone, and the Tavarez Cellphone exchanged messages with the Pimentel Cellphone.

122. At approximately 5:55 p.m., TAVAREZ, driving the Dodge Durango, returned to the area of the Tavarez Premises, opened the trunk of the vehicle, removed a bag, and entered the Tavarez Premises.

123.    At approximately 6:34 p.m., CS-2 contacted SCALEY-SANDOVAL to discuss the cocaine delivery. SCALEY-SANDOVAL stated that he was waiting for his supplier.

124.    Shortly afterwards, the Scaley-Sandoval Cellphone exchanged messages with the Tavarez Cellphone, and the Tavarez Cellphone exchanged messages with the Pimentel Cellphone.

125.    At approximately 6:52 p.m., an LPR camera captured a white GMC pickup truck (the "GMC Pickup") enter the Trenton area. The GMC Pickup is registered to an individual known by law enforcement to associate with PIMENTEL ("Individual-6").

126.    At approximately 6:53 p.m., TAVAREZ exited the Tavarez Premises, entered the Dodge Durango, and drove to the vicinity of the Scaley-Sandoval Premises.

127.    At approximately 6:55 p.m., CS-2 again spoke with SCALEY-SANDOVAL about the cocaine purchase. SCALEY-SANDOVAL stated that he was waiting for his person to deliver the cocaine. Further, he stated that the delivery person had promised to arrive by 7:00 p.m. but as of 6:53 p.m., had not arrived. SCALEY-SANDOVAL stated that he had received a message that the person was nearby.

128.    At approximately 6:57 p.m., TAVAREZ, driving the Dodge Durango, drove down Alleyway-1 towards Ingleton Street.

129.    At approximately 6:58 p.m., SCALEY-SANDOVAL informed CS-2 that the "stuff" was there, referring to the cocaine.

130.    At approximately 7:07 p.m., TAVAREZ, driving the Dodge Durango, reentered Alleyway-1 and parked behind the Scaley-Sandoval Residence. By that time, SCALEY-SANDOVAL was in the front passenger seat of the Dodge Durango.

131.    Shortly afterwards, the Tavarez Cellphone exchanged messages with the Pimentel Cellphone.

132.    At approximately 7:53 p.m., CS-2 called SCALEY-SANDOVAL let him know that he/she had arrived for the previously agreed-upon cocaine transaction.

133.    After CS-2's call, TAVAREZ, driving the Dodge Durango with SCALEY-SANDOVAL in the front passenger seat, drove out of Alleyway-1 and parked on

Temple Street. SCALEY-SANDOVAL exited the Dodge Durango and entered CS-2's vehicle.

134.    Inside of CS-2's vehicle, SCALEY-SANDOVAL explained to CS-2 that the "big boss" in the "large truck" was responsible for bringing the cocaine to Trenton. SCALEY-SANDOVAL further explained that a "friend" of SCALEY-SANDOVAL's received the cocaine to bring it to him. Based on my training and experience, and my knowledge of this investigation, I believe that the "big boss" was referring to Individual-6, the "large truck" referring to the GMC Pickup, and the "friend" was referring to TAVAREZ.

135.    Inside of CS-2's vehicle, SCALEY-SANDOVAL and CS-2 completed the cocaine transaction: SCALEY-SANDOVAL gave CS-2 one kilogram of cocaine, and CS-2 gave SCALEY-SANDOVAL $17,000 in cash in a red bag.

136.    At approximately 7:58 p.m., SCALEY-SANDOVAL exited CS-2's vehicle. He was holding the red bag that contained the $17,000. SCALEY-SANDOVAL reentered the Dodge Durango.

137.    Shortly afterwards, the Tavarez Cellphone exchanged messages with the Pimentel Cellphone.

138.    At approximately 8:03 p.m., TAVAREZ drove away from the Scaley-Sandoval Premises and drove to Alleyway-1. SCALEY-SANDOVAL exited the Dodge Durango. TAVAREZ, driving the Dodge Durango, drove away from the area.

139.    At approximately 8:10 p.m., TAVAREZ parked the Dodge Durango in the vicinity of the Tavarez Premises. TAVAREZ exited the Dodge Durango and entered front passenger door of the GMC Pickup, which had been parked in the vicinity of the Tavarez Premises.

140.    Approximately one minute later, TAVAREZ exited the GMC Pickup and the GMC Pickup drove away. TAVAREZ reentered the Dodge Durango and drove away from the area.

141.    Shortly afterwards, the Tavarez Cellphone exchanged messages with the Pimentel Cellphone.

142.    Law enforcement followed the GMC Pickup it as it drove northbound in the New Jersey Turnpike and Garden State Parkway. The GMC Pickup exited the Garden State Parkway in northern New Jersey.

143.    At approximately 9:32 p.m., law enforcement observed Individual-6 back the GMC Pickup into the driveway of a premises associated with Individual-6.

Individual-6 exited the GMC Pickup and entered the premises. When Individual-6 entered the premises, Individual-6 was holding the red bag.

144.    The cocaine purchased from SCALEY-SANDOVAL was subsequently submitted to a law enforcement laboratory for chemical analysis, where it tested positive for cocaine with a gross weight of 1,023.26 grams.

### N.        The May 2, 2026 Firearm Purchase

145.    During the week of April 13, 2026, SCALEY-SANDOVAL spoke with CS-2 regarding the purchase of firearms. As guided by law enforcement, CS-2 told SCALEY-SANDOVAL that his Mexican contacts wanted to obtain more firearms from CS-2 via SCALEY-SANDOVAL.

146.    On or about April 18, 2026, SCALEY-SANDOVAL discussed with CS-2 a potential firearms transaction to occur on April 19, 2026. SCALEY-SANDOVAL informed CS-2 that his firearms supplier would be traveling to deliver firearms to New York City and Trenton. Based on my training and experience and knowledge of the case, I believe that SCALEY-SANDOVAL's reference to his "firearms supplier" was RIOS.

147.    On or about April 18, 2026, law enforcement observed the location of the Rios Cellphone in close proximity to the Media County Fair Grounds Community Center in Median, Ohio. On that date, the Median Gun Show was being held at the Community Center.

148.    On or about April 27, 2026, SCALEY-SANDOVAL discussed with CS-2 the firearms sale. SCALEY-SANDOVAL informed CS-2 that his suppliers are in Ohio and that the suppliers do not want to store firearms with SCALEY-SANDOVAL. Instead, SCALEY-SANDOVAL stated that his suppliers deliver firearms to Trenton for SCALEY-SANDOVAL to sell. SCALEY-SANDOVAL told CS-2 that he would contact his suppliers to see about a firearm delivery that week. CS-2 advised SCALEY-SANDOVAL to send CS-2 photos of the guns that he has for sale along with prices for them.

149.    On or about April 28, at approximately 11:56 a.m., SCALEY-SANDOVAL sent CS-2 photographs of three firearms. SCALEY-SANDOVAL agreed to sell CS-2 the three firearms for $3,000, with the transaction occurring on May 2, 2026.

150.    During the week of May 1, 2026 at approximately 4:32 p.m., SCALEY-SANDOVAL called CS-2 and requested that the previously agreed-upon firearms transaction occur that day at approximately 6:00 p.m. However, SCALEY-SANDOVAL and CS-2 ultimately agreed to May 2, 2026.

151. On or about May 1, 2026, law enforcement observed the location of the Rios Cellphone departing the area of Lorain, Ohio at approximately 10:50 a.m. and moving east before arriving in New York City at approximately 6:20 p.m.

152. On or about May 2, 2026, law enforcement observed the location of the Rios Cellphone departing New York City around 11:20 a.m. before moving south.

153. At approximately 12:44 p.m., a black 2008 BMW bearing an Ohio registration number (the "2008 BMW") drove into Alleyway-1. The 2008 BMW was registered to a family member of RIOS in Lorain, Ohio. The 2008 BMW entered the backyard of the Scaley-Sandoval Premises.

154. At approximately 1:45 p.m., CS-2 arrived in the vicinity of the Scaley-Sandoval Premises. CS-2 called SCALEY-SANDOVAL to let SCALEY-SANDOVAL know that he/she had arrived.

155. Soon after, SCALEY-SANDOVAL met with RIOS near the driver-side window of the 2008 BMW.

156. At approximately 1:48 p.m., SCALEY-SANDOVAL exited the backyard of the Scaley-Sandoval Premises holding a black bag (the "Scaley-Sandoval's Black Bag") and walked down Alleyway-1. Around this time, law enforcement officers with the Trenton Police Department converged at a location near the Scaley-Sandoval Premises for an unrelated matter. At this time, SCALEY-SANDOVAL turned around and ran through Alleyway-1 before reentering the backyard of his Residence.

157. At approximately 1:53 p.m., SCALEY-SANDOVAL exited the Scaley-Sandoval Premises and reentered Alleyway-1. At the time, he was carrying Scaley-Sandoval's Black Bag. SCALEY-SANDOVAL called CS-2 to confirm that CS-2 was at the agreed-upon meeting location. SCALEY-SANDOVAL, holding Scaley-Sandoval's Black Bag, then entered the front passenger-side door of CS's vehicle.

158. Inside CS-2's vehicle, SCALEY-SANDOVAL informed CS-2 that he saw the "monkeys" and that was why he did not come earlier.[6] SCALEY-SANDOVAL and CS-2 then completed the previously agreed-upon transaction: SCALEY-SANDOVAL gave CS-2 three firearms and associated magazines, which were located in Scaley-Sandoval's Black Bag, and CS-2 gave SCALEY-SANDOVAL $3,000 in cash. The firearms were later identified as a Glock .40 caliber Model 27 handgun, bearing serial

---

[6] Based on my training and experience, "monkeys" is a derogatory term used in certain Spanish speaking countries used to refer to law enforcement officers.

number XYL183, a Diamondback 9mm Model B9 handgun, bearing serial number YN1153, and a Tiasas .45 caliber Model 1911 AL Govt. handgun, bearing serial number T0620-26DS01816.



## O.        The Collective Cocaine

159.    Based on the cocaine deliveries as described above, SCALEY-SANDOVAL, TAVAREZ, and PIMENTEL conspired to transport and distribute approximately 3,853 grams of cocaine in New Jersey.

## P.        The Collective Firearms

160.    Each of the 16 firearms referenced above were tested by law enforcement and determined to be operable as firearms and capable of being discharged.

161.    Each of the 16 firearms referenced above were manufactured outside of the state of New Jersey and, therefore, traveled in interstate or foreign commerce prior to SCALEY-SANDOVAL or RIOS's possessing them in New Jersey on the dates they were delivered to CS-2.